## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Mark Wentworth Home, | ) | |
| | ) | Case No. 10-10246-MWV |
| Debtor | ) | |

## DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT DATED MARCH 23, 2010

PRETI FLAHERTY BELIVEAU &
PACHIOS, PLLP

John M. Sullivan (BNH 01456)
Joshua E. Menard (BNH 06427)
57 North Main Street
PO Box 1318
Concord, NH 03302-1318
Telephone:     603.410.1500
Facsimile:      603.410.1501

Counsel for the Debtor

Dated: March 23, 2010

# EXECUTIVE SUMMARY OF PLAN AND DISCLAIMERS

The following table briefly summarizes the classification and treatment of Claims under the Debtor's Plan of Reorganization dated March 23, 2010 (as it may be subsequently amended, modified or supplemented from time to time, the "Plan"). This executive summary does not contain all terms and conditions of the Plan and is qualified in its entirety by reference to the Plan. Capitalized terms not defined herein have the meanings ascribed to them in the Plan unless otherwise noted.

| Class | Description | Treatment Under The Plan | Estimated Recovery | Status |
|---|---|---|---|---|
| -- | Administrative Expense Claims | Paid in full in cash or as otherwise agreed by the Debtor and the claimant | 100% | Unimpaired |
| -- | Priority Tax Claims | Paid in installments with interest over 3 years | No known claims | Impaired |
| -- | Other Priority Claims | Paid in full in cash or as otherwise agreed by the Debtor and the claimant | No known claims | Unimpaired |
| 1 | Secured Claims | Each holder will retain the lien(s) securing its claim and receive deferred cash payments totaling the Amount of its Secured Claim for 27 yrs at 6.25% | 100% of Secured Parties' Allowed Claims | Impaired |
| 2 | Unsecured Portion of Mortgagee Claim | Holder will have the right to elect between an immediate dividend of 3% or a dividend of 6% paid out in 3 equal annual installments (see pages 7-11) | 3%-6% | Impaired |
| 3 | Lehman Brothers Unsecured Claim | Holder will have the right to elect between an immediate dividend of 3% or a dividend of 6% paid out in 3 equal annual installments (see pages 7-11) | 3%-6% | Impaired |
| 4 | Living Innovations, Inc. Unsecured Claim | Holder will have the right to elect between an immediate dividend of 3% or a dividend of 6% paid out in 3 equal annual installments (see pages 7-11) | 3%-6% | Impaired |
| 5 | General Unsecured Claims | Holder will have the right to elect between an immediate dividend of 3% or a dividend of 6% paid out in 3 equal annual installments (see pages 7-11) | 3%-6% | Impaired |
| 6 | Administrative Convenience Class | Holder will receive a one-time 4.5% dividend | 4.5% | Impaired |
| 7 | Common Stock | Not Applicable[1] | | |

---

[1] The Debtor is a NH not-for-profit corporation and as such has no equity interest holders.

EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THIS DISCLOSURE STATEMENT, THE EXHIBITS HERETO, AND THE PLAN IN ORDER TO MAKE AN INDEPENDENT DETERMINATION AS TO WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. ALTHOUGH THE DEBTOR HAS MADE EVERY EFFORT TO SUMMARIZE ACCURATELY THE TERMS OF THE PLAN IN THE DISCLOSURE STATEMENT, EACH HOLDER OF A CLAIM ENTITLED TO VOTE SHOULD REVIEW THE ENTIRE PLAN AND THE EXHIBITS THERETO BEFORE CASTING A BALLOT. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN SHALL CONTROL.

THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS. CERTAIN OF THE STATEMENTS AND FINANCIAL NUMBERS CONTAINED IN THIS DISCLOSURE STATEMENT AND ITS EXHIBITS INCLUDING, WITHOUT LIMITATION, THE PROJECTIONS INCLUDED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS AND NUMBERS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.

# **TABLE OF CONTENTS**

I.     INTRODUCTION ...........................................................................................1
     A.     Purpose of Disclosure Statement and Enclosures ...............................1
     B.     Overview of Voting Requirements ......................................................2
     C.     Confirmation Hearing .........................................................................2
     D.     Source of Information .........................................................................3
II.     OVERVIEW OF THE DEBTOR AND CHAPTER 11 CASE ........................3
     A.     Description and History of Business ...................................................3
     B.     Significant Events Leading to Commencement of the Chapter 11 Case ..............4
     C.     Assets of the Debtor ...........................................................................4
     D.     Operational Matters ...........................................................................5
     E.     The Chapter 11 Case ..........................................................................5
         1.     Commencement of the Chapter 11 Case ................................5
         2.     First Day Filings and Orders .................................................5
         3.     Retention of Professionals ....................................................5
         4.     Schedules and Statements and Bar Dates ..............................6
     F.     Operating Results During the Chapter 11 Case ..................................6
     G.     Future Business of the Reorganized Debtor ........................................6
III.     SUMMARY OF THE PLAN ...........................................................................7
     A.     Classification and Treatment of Claims .............................................7
     B.     Description of Claims.........................................................................9
         1.     Administrative Expense Claims .............................................9
         2.     Priority Claims .....................................................................9
         3.     Class 1 – Secured Claims .....................................................9
         4.     Class 2 – Unsecured Mortgagee Claim ................................9
         5.     Class 3 – Lehman Brothers Unsecured Claim.......................9
         6.     Class 4 – Living Innovations Unsecured Claim...................10
         7.     Class 5 – General Unsecured Claims ...................................10
         8.     Class 6 – Administrative Convenience Class........................10
     C.     Plan Payments ..................................................................................11
         1.     Class 1 Treatment................................................................11
         2.     Classes 2-6 Treatment .........................................................11
     D.     Conditions to the Effective Date of the Plan ....................................11
IV.     INFORMATION RELEVANT TO RISKS POSED TO CREDITORS UNDER THE
     PLAN .............................................................................................................12
     A.     Risk of Delay or Non-Occurrence of the Confirmation Date and the Effective Date
         .......................................................................................................12
     B.     Non-Consensual Confirmation .........................................................12
     C.     The Debtor Has a History of Operating Losses .................................12
     D.     Risk of No Subsequent Distributions ...............................................13
V.     CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN ........13
     A.     The Confirmation Hearing and Objections .......................................13
     B.     Confirmation Requirements .............................................................14
     C.     Satisfaction of Conditions Precedent to Confirmation under the
         Bankruptcy Code ..............................................................................14
         1.     Best Interests Test ...............................................................14
         2.     Feasibility of the Plan .........................................................16
         3.     Acceptance by Impaired Classes .........................................17
         4.     Confirmation Without Acceptance by All Impaired Classes ...................18
VI.     IMPLEMENTATION OF THE PLAN .........................................................18
     A.     Effect of Plan Confirmation .............................................................18
         1.     Vesting of Control in the Debtor .........................................18
         2.     Cancellation of Instruments .................................................19
         3.     Term of Injunction and Stays ..............................................19
         4.     Exculpation .........................................................................19

| | | | |
|---|---|---|---|
| | B. | Effective Date Actions ................................................................ | 20 |
| | C. | Executory Contracts and Unexpired Leases ................................. | 20 |
| | D. | Distributions Occurring On and After the Effective Date ............... | 20 |
| | E. | Retention of Claims .................................................................... | 21 |
| | F. | Discharge .................................................................................. | 21 |
| | G. | Severability ............................................................................... | 21 |
| VII. | | BAR DATES AND OBJECTIONS TO CLAIMS ............................ | 22 |
| | A. | Administrative Expenses Bar Date .............................................. | 22 |
| | B. | Original Bar Date ....................................................................... | 22 |
| | C. | Objections to Claims .................................................................. | 22 |
| | D. | Estimation of Claims .................................................................. | 22 |
| | E. | Payments and Distributions on Disputed Claims .......................... | 23 |
| | F. | Settlement of Disputed Claims .................................................... | 23 |
| VIII. | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES ................. | 23 |
| | A. | Consequences to the Debtor. ..................................................... | 24 |
| | B. | Consequences to Holders of Allowed Claims .............................. | 24 |
| | C. | Information Reporting and Withholding ........................................ | 25 |
| IX. | | OTHER MATTERS ..................................................................... | 26 |
| | A. | Alternatives to Confirmation and Consummation of the Plan .......... | 26 |
| | | 1. Liquidation Under Chapter 7 or Chapter 11 ..................... | 26 |
| | | 2. Alternative Chapter 11 Plan ........................................... | 27 |
| | B. | Amendment, Alteration, and Revocation of the Plan ..................... | 27 |
| X. | | CONCLUSION AND RECOMMENDATION ................................... | 27 |


| | |
|---|---|
| Exhibit A: | Solicitation Order |
| Exhibit B: | Liquidation Analysis |
| Exhibit C: | Budget and Projections |
| Exhibit D: | Three Year Projections |

# I.     INTRODUCTION

## A.     Purpose of Disclosure Statement and Enclosures

On January 27, 2010 (the "Petition Date"), Mark Wentworth Home. (the "Debtor"), a New Hampshire not-for-profit corporation and the debtor and debtor in possession in the above-captioned Chapter 11 case (the "Chapter 11 Case"), filed a voluntary petition for relief under Chapter 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of New Hampshire (the "Bankruptcy Court"). The Debtor transmits this disclosure statement (the "Disclosure Statement") pursuant to Section 1125 of the Bankruptcy Code to all known creditors of the Debtor who are entitled to vote in connection with the solicitation of acceptances of the Debtor's Plan of Reorganization dated January 27, 2010 (as it may be altered, amended, modified or supplemented from time to time, the "Plan"). Capitalized terms not defined herein have the meanings ascribed to them in the Plan unless otherwise noted.

This Disclosure Statement sets forth certain information regarding the Debtor's prepetition operations, the need to seek protection under Chapter 11 of the Bankruptcy Code, significant events that have occurred or are expected to occur during the Debtor's Chapter 11 Case and the anticipated organization, operations and financing of the Debtor upon successful emergence from Chapter 11. This Disclosure Statement also describes terms and provisions of the Plan and the manner in which distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of claims entitled to vote on the Plan must follow for their votes to be counted.

On March 15, 2010, after notice and a hearing, the Bankruptcy Court held a preliminary hearing on the Disclosure Statement and directed the Debtor to file the First Amended Disclosure Statement and stating that the Court would then enter an order, among other things, (i) approving this Disclosure Statement as containing "adequate information" as required by Section 1125(b) of the Bankruptcy Code sufficient to enable hypothetical, reasonable investors typical of the Debtor's creditors to make an informed judgment whether to accept or reject the Plan, and (ii) establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan (the "Solicitation Order"). A copy of the Solicitation Order is annexed hereto and made a part hereof as Exhibit A.

In addition, a ballot for the acceptance or rejection of the Plan (a "Ballot") is enclosed with this Disclosure Statement submitted to the holders of claims that are entitled to vote to accept or reject the Plan (a "Voting Claim").

**APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT OF ANY OF THE REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT OR IN THE PLAN, NOR DOES IT CONSTITUTE AN ENDORSEMENT OF THE PLAN ITSELF.**

**THE DEBTOR BELIEVES THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR, ITS CREDITORS AND ALL PARTIES IN INTEREST. THE DEBTOR URGES ALL IMPAIRED CREDITORS ENTITLED**

**TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.**

**THE PLAN IS THE BEST ALTERNATIVE FOR GENERAL UNSECURED CREDITORS OF THE DEBTOR AS IT PROVIDES A PROMPT AND BETTER RECOVERY THAN WOULD BE RECOVERED UNDER A CHAPTER 7 LIQUIDATION OR IN THE EVENT THE DEBTOR ATTEMPTED TO CONTINUE TO OPERATE WITHOUT REORGANIZATION.**

B. <u>Overview of Voting Requirements</u>

Pursuant to the Bankruptcy Code, only holders of claims in classes that are (a) treated as "impaired" by a plan of reorganization and (b) entitled to receive a distribution under such plan are entitled to vote on the Plan. Holders of claims in the following classes are "impaired" and entitled to vote to accept or reject the Plan: (i) Class 1: Secured Claims; (ii) Class 2: Unsecured Mortgagee claim; (iii) Class 3: Lehman Brothers' unsecured claim; (iv) Class 4: Living Innovations, Inc.'s unsecured claim; (v) Class 5: General Unsecured creditors; and (vi) Class 6: Administrative Convenience Class.  Holders of Administrative Expense Claims, and Priority Claims are unimpaired, conclusively presumed to have accepted the Plan under the Bankruptcy Code, and therefore are not entitled to vote on the Plan.

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.

**TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE <u>RECEIVED</u> ON OR BEFORE 4:30 P.M. (NEW HAMPSHIRE TIME) ON April 26, 2010 (THE "VOTING DEADLINE").**

Ballots should be sent by first-class mail postage prepaid to:

Preti Flaherty, PLLP
P.O. Box 1318
Concord, NH 03302-1318
Attention:  John M. Sullivan
MWH Ballot Processing

Ballots received by facsimile or electronic mail, or received after the Voting Deadline, will **<u>NOT</u>** be counted, unless the Bankruptcy Court otherwise orders.

If you are a holder of a claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please call John M. Sullivan or Gregory A. Moffett at (603) 410-1500.

C. <u>Confirmation Hearing</u>

The Chapter 11 Case is currently pending in the Bankruptcy Court before the Honorable Mark W. Vaughn, United States Bankruptcy Judge. The Bankruptcy Court has scheduled a hearing on confirmation of the Plan (the "Confirmation Hearing") at 9:00 a.m. (Eastern Time) on April 30, 2010, to be convened at the United States Bankruptcy Court for the District of New Hampshire, 1000 Elm Street, 11th Floor, Courtroom 1, Manchester, New Hampshire. The

Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of such adjournment at the Confirmation Hearing or at any subsequent, adjourned Confirmation Hearing.

        D.      <u>Source of Information</u>

The information contained in this Disclosure Statement was derived from the Debtor's books and records and consultations with the Debtor's management.


## II.      OVERVIEW OF THE DEBTOR AND CHAPTER 11 CASE

        A.      <u>Description and History of Business</u>

The Debtor operates The Mark Wentworth Home (the "Home"), a state-of-the-art, not-for-profit, senior living community designed to create a culture of successful aging for Assisted Living and Nursing Home residents. The Home is located at 346 Pleasant Street in Portsmouth, NH and has been in operation for 100 years having admitted its first resident in 1911. Today, through modern amenities, an emphasis on health and well-being, and myriad activities, the Home provides seniors with a safe, secure and personally fulfilling community.

The Home has two residential programs and one community outreach program known as "Wentworth Connections." The residential programs include a 48 suite assisted living program, and a 19 bed nursing home program with 8 Medicaid certified beds. The Wentworth Connections program is the result of a 2009 merger that consolidated the Portsmouth Senior Center, the Senior Transportation program, the Compass Care Adult Day Care, and H2U programs into the Debtor.

Residents in assisted living receive help with nutritional issues, daily medications, transportation needs and are part of an active community. Residents with various stages of dementia are integrated with supervision into the general resident population. There are currently 38 residents in the assisted living program.

Residents in the nursing facility have more advanced needs. In most cases, nursing facility residents are either in their final years or suffering from late stage dementia. The nursing facility also on occasion houses short term residents on a respite stay. There are currently 17 residents in the nursing facility.

The Wentworth Connections program is built around a senior community center located at 127 Parrott Avenue in Portsmouth. The Wentworth Connections senior transportation program provides approximately 2,000 rides per month to seniors coming to the center or going out to medical appointments, shopping etc. The Day Program at the Center is operated from 8 a.m. to 4:30 pm weekdays and includes meals, nursing and personal care, respite and support for family caregivers. The Day Program also conducts appropriate activities for roughly 20 seniors with varying degrees of dementia. Wentworth Connections also coordinates activities with the local hospital, providing a series of discounts and educational opportunities to Seacoast seniors.

B.    Significant Events Leading to Commencement of the Chapter 11 Case

In the Fall of 2006, the Home began a renovation project to improve its main facility at 346 Pleasant Street in Portsmouth, New Hampshire.  The total project cost was $14.0 million including upfront financing expenses.  The funds were obtained through a bond offering of the Business Finance Authority of the State of New Hampshire.  The Bank of New York ("BONY") serves as Indenture Trustee for such bond offering and TD Banknorth, N.A. ("TD Bank") provided credit enhancement to the bond offering via a secured Letter of Credit (such financing to be referred to hereafter as the "2006 Facility" and BONY and TD Bank shall be collectively referred to as either BONY/TD Bank or the "Partially Secured Creditor").  The bonds were variable rate demand bonds.  To manage the interest rate risk inherent in variable rate debt the Home was required by BONY/TD Bank to enter into an interest rate swap with Lehman Brothers Special Financing, Inc. as the counterparty.

The 2006 Facility was closed in a period of easy credit and 'irrational exuberance' in the financial markets.  Based on demographic trends and an overall bright economic picture, the financing of assisted living properties was common.  Conventional wisdom foresaw unlimited demand with an aging population and steadily rising revenues.

Starting in 2007, however, the U.S. fell into the most severe economic downturn since the great depression.  The Home's economic model was no longer valid.  As personal net worths crashed and virtually all asset classes experienced a 40%-60% diminution in value, prospective residents began having difficulty affording residency at the Home.  To drive occupancy and respond to competitive pressures, the Home and other similarly situated facilities reduced daily room rates by nearly 50% almost overnight.

In September of 2008, in the midst of the downturn, the financial crisis hit Wall Street. Even once impregnable Lehman Brothers and its affiliates (collectively "Lehman Brothers") including Lehman Brothers Special Financing, Inc. filed for bankruptcy.  In due course, the Home came to learn just how "special" the derivative financing arrangement with Lehman Brothers Special Financing, Inc. was.

The Lehman Brothers bankruptcy triggered and accelerated the Home's interest rate swap agreement at a time when interest rates were running against the Home's interest.  As a result of the termination of the interest rate swap, Lehman Brothers has advised the Debtor that approximately $1.8 million is owed to Lehman Brothers in damages and termination expenses. Meanwhile, the default of Lehman Brothers has caused Partially Secured Creditor to also declare the Debtor in default on the 2006 Facility.  Recent decisions from the U.S. Bankruptcy Court for the Southern District of New York have made clear that the Lehman Brothers demand must be taken most seriously.

Given the Debtor's resources, it is impossible to pay Lehman Brothers and still be able to provide safe and quality care for the Debtor's residents.

C.    <u>Assets of the Debtor</u>

Historically, the Debtor's most significant assets are the land, building and personal property located at 346 Pleasant Street in Portsmouth, NH.  A current appraisal of these assets associated with the Home produces a value of $6.2 million.  The land and buildings utilized by the Wentworth Connections program located at 127 Parrott Avenue in Portsmouth has been appraised at $366,000.  The Debtor also had on the Petition Date accounts receivable of $44,000 and other miscellaneous assets (including vehicles) of $60,000.

The Debtor has available cash resources of roughly $803,000.00.  The Debtor is an income beneficiary of certain restricted testamentary trusts, which generate roughly $202,000.00 annually.  In the course of structuring the 2006 Facility, the N.H. Attorney General's Office opined that the corpus of such testamentary trusts may never be invaded by the Debtor or its creditors and that the right to income on such corpus is not transferable.  Should the Debtor cease operations, such income beneficiary rights will be redirected to another charity serving the senior community.

D.    <u>Operational Matters</u>

The Debtor's 2010 operating plan establishes post-bankruptcy that the Debtor will be able to operate effectively.  <u>See</u> Exhibit C.  The Home's debt service coverage ratio is projected to be 1:1.1.

On a managerial level, the Home's operations have been stabilized with the recent hiring of a new Executive Director, a new Assisted Living Administrator and a new Director of Nursing.  The Home has also strengthened its staffing at the CFO and Controller positions.

The Home as a N.H. non-profit has no shareholders and operates for the common good.  The Home is directed by a volunteer Board of Trustees comprised of 15 members of the Seacoast community.

E.    <u>The Chapter 11 Case</u>

1.    *Commencement of the Chapter11 Case*

On the Petition Date, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court. Since the Petition Date, the Debtor has functioned as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code and has continued to operate its business as described below. No committee of creditors or any other party in interest has been appointed in the Chapter 11 Case.

2.    *First Day Filings and Orders*

On the Petition Date, the Debtor filed a series of customary pleadings to assure the steady and continuing operation of the Home and its programs on an ordinary course of business basis.  The Debtor also filed its Reorganization Plan and Disclosure Statement and asked this Court to as quickly as possible schedule hearings to cause the Home's rapid emergence from Chapter 11.  The Home also filed a Motion to value its primary assets for purposes of Plan confirmation.

3.	Retention of Professionals

Effective as of the Petition Date, the Bankruptcy Court authorized the Debtor's retention of Preti Flaherty, PLLP ("Preti") as general bankruptcy counsel for the Debtor.  In connection with its retention, Preti received a retainer of $120,000.  Preti shall be entitled to seek compensation through the Bankruptcy Court for its professional services rendered and for the reimbursement of expenses incurred.

4.	Schedules and Statements and Bar Dates

On January 27, 2010, the Debtor filed its Statement of Financial Affairs and Schedules of Assets and Liabilities (collectively, as amended, the "Schedules").

On January 27, 2010, the Court issued a Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines, setting (a) May 27, 2010 as the deadline for all creditors, except governmental units, to file proofs of claim (the "First Bar Date") and (b) July 26, 2010 as the deadline for all governmental units to file proofs of claim in the Chapter 11 Case (the "Government Bar Date").

F.	Operating Results During the Chapter 11 Case

The Debtor will file its Monthly Operating Reports following the Petition Date through the Confirmation of the Plan with the Office of the United States Trustee for the District of New Hampshire and the Bankruptcy Court.

G.	Future Business of the Reorganized Debtor

After the Effective Date of the Plan, the Reorganized Debtor pursuant to the Plan, will continue to operate the Home business.

The Debtor's budget and operational projections, which are attached to this Disclosure Statement as Exhibit C (the "Projections"), suggest that, as reorganized, the Home will generate in fiscal year 2010 sufficient cash flow to pay the Reorganized Debtor's current debt obligations and to fund future operations of the Home.  As described below and in the Projections, there can be no assurances that the Projections will be realized and actual results will vary from the Projections, which variations may be material and are likely to increase over time.

### III.    SUMMARY OF THE PLAN

THE FOLLOWING SUMMARY HIGHLIGHTS CERTAIN OF THE SUBSTANTIVE PROVISIONS OF THE PLAN, AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE PLAN. THE DEBTOR URGES ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR TO READ AND STUDY CAREFULLY THE PLAN.

A.      <u>Classification and Treatment of Claims</u>

Section 1123 of the Bankruptcy Code provides that a plan of reorganization must categorize claims against and equity interests in a debtor into individual classes. In accordance with Section 1123, the Plan creates 6 Classes of Claims. Pursuant to Section 1123(a)(l), Administrative Expense Claims, and Other Priority Claims against the Debtor are not classified for purposes of voting on or receiving distributions under the Plan. Such Claims are treated separately in accordance with the requirements set forth in Section 1129(a)(9) of the Bankruptcy Code and are not entitled to vote on the Plan.

The classes in the Plan take into account the differing nature and priority of Claims against the Debtor. A Claim will be deemed classified in a particular class only to the extent such Claim is substantially similar to the other Claims of such class and will be deemed classified in a different class to the extent that any remainder of the Claim qualifies within the description of such different class. A Claim is in a particular class and entitled to a distribution only to the extent of the Allowed Amount of such Claim.

Under the Plan, the Allowed Amount of a Claim is: (I) as to a Claim other than a Claim for Administrative Expenses, (a) the amount of the Claim Scheduled by the Debtor, if (i) the Claim is not Scheduled as disputed, unliquidated, or contingent by the Debtor, (ii) no objection to that amount is filed by the Claims Objection Date, and (iii) the holder of the Claim has not filed by the applicable Bar Date a properly prepared proof of claim in an amount different from that Scheduled by the Debtor; (b) the amount set forth by the holder of the Claim in a properly prepared proof of claim filed by the Bar Date, if (i) that amount differs from the amount Scheduled by the Debtor and (ii) no objection to the amount stated in the proof of claim is filed by the Claims Objection Date; or (c) if neither clause (a) or clause (b) applies, the amount of such Claim established by a Final Order of the Bankruptcy Court or by mutual agreement between the Debtor and the holder of the Claim; and (II) as to a Claim for Administrative Expenses, the amount mutually agreed by the Debtor and the holder of the Claim or, if the Debtor and the holder of the Claim cannot agree or if the Claim is a Claim for Administrative Expenses of a professional retained pursuant to Section 327 of the Bankruptcy Code or otherwise requiring Bankruptcy Court approval, the amount established by a Final Order of the Bankruptcy Court.

Unless otherwise provided in the Plan or Confirmation Order, the treatment of any Claim under the Plan will be in full satisfaction, settlement, release and discharge of such Claim, provided that the discharge will not affect the liability of any entity other than the Debtor on such Claim, nor will the discharge affect the obligations of the Debtor under the Plan.

The following table briefly summarizes the classification of Claims under the Plan, the Debtor's estimate of the Allowed Amount of such Claims, and the proposed distributions for each class of Claims pursuant to the treatment described in the Plan:

| Class | Description | Treatment Under The Plan | Estimated Recovery | Status |
|-------|-------------|--------------------------|--------------------|--------|
| -- | Administrative Expense Claims | Paid in full in cash or as otherwise agreed by the Debtor and the claimant | 100% | Unimpaired |
| -- | Priority Tax Claims | Paid in installments with interest over 3 years | No known claims | Impaired |
| -- | Other Priority Claims | Paid in full in cash or as otherwise agreed by the Debtor and the claimant | No known Claims | Unimpaired |
| 1 | Secured Claims | Each holder will retain the lien(s) securing its claim and receive deferred cash payments totaling the Amount of its Secured Claim for 27 yrs at 6.25% | 100% of Secured Parties Allowed Claims | Impaired |
| 2 | Unsecured Portion of Mortgagee Claim | Holder will have the right to elect between an immediate dividend of 3% or a dividend of 6% paid out in 3 equal annual installments (see pages 7-11) | 3%-6% | Impaired |
| 3 | Lehman Brothers Unsecured Claim | Holder will have the right to elect between an immediate dividend of 3% or a dividend of 6% paid out in 3 equal annual installments (see pages 7-11) | 3%-6% | Impaired |
| 4 | Living Innovations, Inc. Unsecured Claim | Holder will have the right to elect between an immediate dividend of 3% or a dividend of 6% paid out in 3 equal annual installments (see pages 7-11) | 3%-6% | Impaired |
| 5 | General Unsecured Claims | Holder will have the right to elect between an immediate dividend of 3% or a dividend of 6% paid out in 3 equal annual installments (see pages 7-11) | 3%-6% | Impaired |
| 6 | Administrative Convenience Class | Holder will receive a one-time 4.5% dividend | 4.5% | Impaired |

B.    Description of Claims

*1.    Administrative Expense Claims*

Claims for Administrative Expenses are Claims constituting a cost or expense of administration of the Chapter 11 Case under Sections 503(b) of the Bankruptcy Code. Such Claims include all actual and necessary costs and expenses of preserving the estates of the Debtor, all actual and necessary costs and expenses of operating the business of the Debtor, any obligations incurred or assumed by the Debtor in connection with the conduct of their business,

The amounts reflected in this column are estimated by the Debtor and do not reflect the Allowed amount of Claims. These estimates are not binding on the Debtor, and the Debtor reserves all rights to object to Claims.

All Allowed Administrative Expenses arising from trade and service debts and obligations incurred in the normal course of business by the Debtor during its Chapter 11 Case shall be paid in full by the Debtor in accordance with their terms as they come due in the ordinary course of business, or as otherwise agreed by the Debtor and the holder of the Claim. All other Administrative Expenses allowed under Section 503(b) of the Bankruptcy Code, including, without limitation, any Allowed Administrative Expenses of professionals retained pursuant to Section 327 of the Bankruptcy Code, to the extent that such Claims and expenses constitute Allowed Claims, shall be paid by the Debtor in full in immediately available funds by the latest of (a) ten (10) days after the date that an order of the Bankruptcy Court allowing the Claim becomes a Final Order, (b) the Effective Date, or ( c) such later date as may be agreed by the Debtor and the respective holder(s) of such Claim.

The Debtor estimates that Administrative Expense Claims will total approximately $143,940 and will be composed of: (i) $100,000 for legal services provided by Preti; (ii) $15,000 for legal services provided to the Unsecured Creditors Committee; (iii) $5,000 for the fees of the Ombudsman; (iv) $15,000 for the fees of other professional (the appraisers); and (v) $8,940 for United States Trustee fees for the next four quarters.

*2.    Priority Claims*

The Debtor is not presently aware of any Priority Claims.

*3.    Class 1- Secured Claims*

Class 1 consists of the secured claim of BONY/TD Bank to the extent such claim is allowed by the Court.  As of the Petition Date, BONY/TD Bank's collateral consisted of the Pleasant Street facility; 3 non-severable rental units that are part of the Pleasant Street facility known as 3, 5 and 18 Melcher Street; the Parrott Avenue Garage Property, and equipment and the accounts receivable.  The Debtor anticipates that the Class 1 Claim will therefore be allowed at no more than $6.244 million.  Class 1 Claims are impaired under the Plan. Each holder of a Class 1 Claim is entitled to vote on the Plan on account of its respective Class 1 Claim.

TD Bank disputes the Debtor's valuation of its collateral and reserves its rights to

contest the Debtor's valuation as well as object to its treatment of its claim(s) in the Debtor's Disclosure Statement, Chapter 11 Plan and all amendments thereto.

TD Bank will retain its current mortgages and security interests until TD Bank's secured claim, as determined by the Bankruptcy Court or otherwise agreed to by the parties, is paid in full pursuant to the terms of the Debtor's Chapter 11 Plan.

### 4.   Class 2 – Unsecured Portion of Mortgagee Claim

Class 2 consists of the unsecured portion of the Debtor's indebtedness to BONY/TD Bank.  The Debtor anticipates that the Class 2 Claim will be allowed at approximately $7.025 million.  Class 2 Claims are impaired under the Plan. Each holder of a Class 2 Claim is entitled to vote on the Plan on account of its respective Class 2 Claim.

### 5.   Class 3 – Lehman Brothers Unsecured Claim

Class 3 consists of the unsecured claim of Lehman Brothers.  The Debtor anticipates that the Class 3 Claim will be allowed at no more than $1.8 million.  Class 3 Claims are impaired under the Plan. Each holder of a Class 3 Claim is entitled to vote on the Plan on account of its respective Class 3 Claim.

### 6.   Class 4 – Living Innovations Unsecured Claim

Class 4 consists of the unsecured claim of Living Innovations, Inc.  The Debtor anticipates that the Class 4 Claim will be allowed at no more than $209,000.  Class 4 Claims are impaired under the Plan. Each holder of a Class 4 Claim is entitled to vote on the Plan on account of its respective Class 4 Claim.

### 7.   Class 5 – General Unsecured Claims

Class 5 consists of all Allowed Claims of every kind and nature which any Entity holds against the Debtor (estimated at $55,126) other than Claims for Administrative Expenses, Priority Claims, Administrative Convenience Claims and Claims of Classes 1-4.  The Class 5 Claims include, without limitation, all such Allowed Claims arising out of goods sold or services rendered to the Debtor prior to the Petition Date and any Allowed Claims that are characterized as prepetition general unsecured Claims pursuant to stipulations between the parties or pursuant to Final Order of the Bankruptcy Court.  Class 5 Claims are impaired under the Plan. Each holder of a Class 5 Claim is entitled to vote on the Plan on account of its respective Class 5 Claim.

### 8.   Class 6 – Administrative Convenience Class

Class 6 consists of all Administrative Convenience Claims against the Debtor. Claimants in the Administrative Convenience Class includes all Allowed Claims against the Debtor in the amount of $2,000.00 or less (in the aggregate for any one Creditor) or those creditors that elect to be reduce their Allowed Claim to the amount of $2,000.00 in their ballot.  The total amount of claims in this case is in the approximate amount of $14,325.

C.     Plan Payments[2]

1. *Class 1 Treatment*.  Pursuant to the Plan, on account of and in full satisfaction, release, and discharge of the Class 1 Claims, the Debtor will amortize the secured portion of the BONY/TD Bank claim in equal monthly payments over the balance of the existing term (27 years) at a fixed rate of interest set at 3% over the *Wall Street Journal* Prime Rate as of the Petition Date.  Assuming an Allowed Claim of $6.244 million, payments shall commence one month after Confirmation at the monthly rate of $39,940.16.

2. *Classes 2-5 Treatment*.  Pursuant to the Plan, on account of and in full satisfaction, release, and discharge of all Class 2-5 Claims, each holder of an Allowed Class 2-5 Claim as part of the balloting process shall be entitled to <u>elect</u> to receive either:

(i)     within sixty (60) days of Confirmation a distribution in cash equal to three percent (3%) of the Allowed Amount of the Class 2-5 Claim of such holder; or

(ii)    three (3) equal annual distributions in cash each equal to two percent (2%) of the Allowed Amount of the Class 2-5 Claim of such holder (in aggregate a 6% dividend).  The first of such annual payments shall be made within sixty (60) days of Confirmation.  The payments to be made thereafter shall be made on the first and second anniversary date of the Confirmation date.

The holders of Class 2-5 Claims shall be entitled to no other or further distributions than is elected by them as part of the balloting process.

3. *Class 6 Treatment*.  Pursuant to the Plan, on account of and in full satisfaction, release, and discharge of all Class 6 Claims, each holder of an Allowed Class 6 Claim shall receive a within sixty (60) days of Confirmation a distribution in cash equal to four and one-half percent (4.5%) of the Allowed Amount of the Class 6 Claim of such holder.

D.     <u>Conditions to the Effective Date of the Plan</u>

All of the following conditions must be satisfied or waived in accordance with the Plan prior to the occurrence of the Effective Date (the "Conditions"):

(a)    An order confirming the Plan, acceptable to the Debtor, shall have been entered by the Bankruptcy Court, shall be in full force and effect, and shall have become, and shall be, a Final Order;

(b)    All authorizations, filings, consents, regulatory approvals, rulings, letters, opinions, or documents, if any, that are determined by the Debtor to be necessary to implement the Plan shall have been made, provided, or obtained and shall be in full force and effect.

Except as otherwise prohibited by the Bankruptcy Court or the Bankruptcy Code, any of

---

[2] If TD Bank elects to make its 11 U.S.C. § 111(b)(2) election and/or the valuation of its collateral is later determined to be greater than the Debtor's valuation, then there may be additional funds available to Classes 2-6. which may result in an increased dividend to those classes.

the Conditions may be waived in a writing signed by the Debtor, in its sole discretion.

If the Confirmation Order is vacated for any reason, the Plan shall be null and void in all respects and nothing contained in the Plan or this Disclosure Statement shall constitute a waiver or release of any Claims by or against the Debtor, shall prejudice in any manner the rights of the Debtor, or shall constitute an admission, acknowledgement, offer, or undertaking by the Debtor in any respect.

## IV. INFORMATION RELEVANT TO RISKS TO CREDITORS UNDER THE PLAN

The following is a summary of certain matters that should be considered, together with all other relevant matters, in connection with the Plan. This summary is not intended to be a complete list of important matters that persons voting on the Plan should consider. Holders of Voting Claims against the Debtor should analyze and evaluate the Plan and the other information set forth in this Disclosure Statement and in the Exhibits hereto with their respective advisors in determining whether to vote to accept or reject the Plan. In the event of any inconsistencies between the Plan and the summary of certain of its terms provided in this Disclosure Statement, the Plan shall control.

### A. Risk of Delay or Non-Occurrence of the Confirmation Date and the Effective Date

The Plan can only be confirmed if it complies with various legal requirements set forth in the Bankruptcy Code and outlined in this Disclosure Statement. Moreover, the occurrence of the Effective Date is subject to various conditions set forth in the Plan that must be satisfied or, in some instances, waived prior to the occurrence of the Effective Date. *See Section III. C Conditions to Effective Date of the Plan.* There may be delays in satisfying the conditions to the occurrence of the Effective Date, and there is no assurance that these conditions will be met or, as applicable, waived. It is also possible that the Plan is not confirmed in which case the Debtor's Chapter 11 Case might be converted to a case under Chapter 7 and the Debtor's creditors would likely receive substantially less than what they would receive under the Plan.

### B. Non-Consensual Confirmation

In the event any impaired class of Claims does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the request of the Debtor if at least one impaired Class has accepted the Plan (such acceptance being determined without including the vote of any "insider" (as defined in the Bankruptcy Code) in such class), and as to each impaired class that has not accepted the Plan, if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.

### C. The Debtor Has a History of Operating Losses

The Debtor anticipates that its financial results, once completed, will demonstrate operating losses for the fiscal year ended December 31, 2009. Although the Projections suggest an estimated operating profit in fiscal year 2010, there can be no guarantee that the restructuring contemplated by the Plan will end such operating losses; that the Home will achieve the

occupancy levels necessary to meet its projections; and/or that the Home will not require unexpected capital improvement and maintenance beyond the Debtor's ability to finance. Losses could negatively affect the Reorganized Debtor's working capital, the extension of credit by vendors and other trade creditors, and the Reorganized Debtor's ability to implement its business strategy.

D.     Risk of No Subsequent Distributions

The Plan gives holders of Claims in Classes 2-5 the right to elect payments paid over three (3) calendar years.  On the subsequent distribution dates, the Debtor's ability to pay will be contingent on the availability of cash to make such distribution.  There is a risk that there may not be sufficient cash available to make one or both of the subsequent distributions called for under the Plan.

Post-confirmation the Debtor will be solvent and have reserves equal to $700,000, so long as operations do not materially deviate from the budget; the subsequent distributions will not be at risk.  The subsequent distributions may be at risk if the Debtor has unexpected post-confirmation losses in excess of $1 million from May 2010 until December 2012.  See Exhibit D, three (3) year projections.

V.     **CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN**

A.     The Confirmation Hearing and Objections

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing. The Confirmation Hearing in respect of the Plan has been scheduled for April 30, 2010, commencing at 9:00 a.m. Eastern Time, before the Honorable Mark W. Vaughn, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of New Hampshire, 1000 Elm Street, 11th Floor, Courtroom 1, Manchester, New Hampshire. The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of such adjournment at the Confirmation Hearing or at any subsequent, adjourned Confirmation Hearing.

The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before April 26, 2010 at 4:30 p.m. Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, the nature of the claim of such objector, and all grounds for the objection. Objections must be timely filed with the Bankruptcy Court and served upon: (i) Mark Wentworth Home, Inc., c/o Preti Flaherty, PLLP, P.O. Box 1318, Concord, NH 03302-1318, Fax: (603) 410-1501, Attn: John M. Sullivan, Esq.;  and (ii) Office of the United States Trustee, 1000 Elm Street, Suite 605, Manchester, NH 03101, Fax: (603) 666-7913, Attn: Geraldine Karonis, Esq.

Objections to confirmation are governed by Bankruptcy Rule 9014 and the Solicitation Order. PURSUANT TO ORDER OF THE BANKRUPTCY COURT, UNLESS A WRITTEN OBJECTION TO CONFIRMATION IS DULY AND TIMELY FILED AND SERVED, THE

BANKRUPTCY COURT IS NOT REQUIRED TO CONSIDER SUCH OBJECTION.

B.      Confirmation Requirements

In order for a plan of reorganization to be confirmed, the Bankruptcy Code requires, among other things, that such plan be proposed in good faith, that the proponent of such plan disclose specified information concerning payments made or promised to insiders, and that such plan comply with the applicable provisions of Chapter 11 of the Bankruptcy Code.  Section 1129(a) of the Bankruptcy Code also imposes requirements that each dissenting member of a class receive at least as much under the Plan as it would receive in a Chapter 7 liquidation of the debtor, that at least one class of impaired claims has accepted the Plan, that confirmation of the Plan is not likely to be followed by the need for further financial reorganization, and that the Plan is "fair and equitable" with respect to each class of Claims that is impaired under the Plan and fails to accept the Plan by the required majorities. The Bankruptcy Court will confirm the Plan only if it finds that all of the applicable requirements enumerated in Section 1129(a) of the Bankruptcy Code have been met or, if all of the requirements of Section 1129(a) other than the requirements of Section 1129(a)(8) have been met (i.e., that all impaired classes have accepted the Plan), that all of the applicable requirements enumerated in Section 1129(b) of the Bankruptcy Code have been met.

THE DEBTOR BELIEVES THAT THE PLAN SATISFIES OR WILL SATISFY, AS OF THE CONFIRMATION DATE, ALL OF THE REQUIREMENTS FOR CONFIRMATION.

C.      Satisfaction of Conditions Precedent to Confirmation under the Bankruptcy Code

1.      *Best Interests Test*

(a)      Liquidation Analysis

Section 1129(a)(7) of the Bankruptcy Code requires, with respect to each impaired class under a plan of reorganization, that each holder of an allowed claim in such class either (a) has accepted the plan or (b) will receive or retain under the plan on account of such claim property of a value, as of the effective date of such plan, that is not less than the amount that such person would receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code on the effective date.

To calculate the probable distribution to holders of each impaired class of claims if a debtor were liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced first by the claims of secured creditors to the extent of the value of their collateral and then by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and the Chapter 11 case. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by

the debtor in its Chapter 11 case (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the Chapter 7 case, litigation costs, and claims arising from the operations of the debtor during the pendency of the Chapter 11 case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims.

Once a bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

The Debtor has prepared an analysis of the distributions that its creditors are likely to receive in a hypothetical Chapter 7 liquidation, a copy of which is attached to this Disclosure Statement as Exhibit B (the "Liquidation Analysis"), to determine whether each creditor will receive more under the Plan than it would receive in a Chapter 7 liquidation. The Debtor has estimated, hypothetically, the realizable value of its assets through liquidation in a Chapter 7 bankruptcy proceeding as well as the costs that would be incurred and the additional liabilities that would arise in such a liquidation proceeding. The Debtor has then applied the proceeds of the liquidation to satisfaction of creditor claims in accordance with the distribution requirements of Chapter 7 of the Bankruptcy Code to determine the amount of distributions the different classes of its creditors would receive in a liquidation.

As described more fully in the Liquidation Analysis, the Liquidation Analysis is based on a number of estimates and assumptions that, although considered reasonable by the Debtor, are inherently subject to significant uncertainties and contingencies beyond the control of the Debtor. There can be no assurance that the recoveries and estimated liquidation expenses set forth in this analysis would be realized if the Debtor was, in fact, to undergo such a liquidation.

(b)     Conclusion of Liquidation Analysis

As set forth in the Liquidation Analysis, the Debtor believes that a Chapter 7 liquidation of the Debtor's estate would result in a substantial diminution of the value to be realized if the Debtor were to continue operations as a going concern under the Plan. In a Chapter 7 liquidation, the Home would cease operations and as a very large single-purpose facility, the Debtor anticipates that the Secured Creditor would have a difficult time liquidating its collateral, since many potential buyers would be scared off by the Home's zoning and municipal tax situation. With few buyers, there would be a substantial risk that the Secured Creditor's deficiency claim in a Chapter 7 case would materially increase and thereby increase the total unsecured claims. Based on its zoning, location and extreme lack of parking, the Home may not be converted to another use.  Further, the Debtor has a favorable tax arrangement (saving in excess of $125,000 annually) with the City of Portsmouth that would not be available to for-profit operator.  The Liquidation Analysis assumes that a forced sale of the Home would result in recovery of only sixty-five percent (65%) of the estimated $6.2 million market value of BONY/TD Bank's real and personal property collateral and seventy-five percent (75%) of TD Bank's accounts receivable collateral, creating an increase in BONY/TD Bank's unsecured claim by $2,170,000,

resulting in total unsecured claim of $9,195,000.

A liquidation of the Debtor and closure of the Home would also create considerable wind-down expenditures given the nature of the Debtor's duties to care for and relocate all residents. In order to comply with State and Federal law, the Home could anticipate 3 months of full operation with substantially reduced revenues coming in. The Debtor, during such 'wind-down' period, would experience negative cash flow of at least $540,000. A further complication of a liquidation would be the Debtor's liability for severance payments to its staff to comply with the WARN Act. The Debtor estimates its WARN Act liability at $250,000.

The estimated liquidation proceeds would be allocated first to the costs of administration of the Debtor's estate, including estimated fees and expenses incurred by counsel to a Chapter 7 trustee in pursuing the case and liquidating the Debtor's other assets. If the administrative claims were paid in full in a liquidation of the Debtor's estate, the remaining assets of the Debtor's estate would be applied to claims of unsecured creditors in the order of priority under Section 507 of the Bankruptcy Code, first being allocated to satisfy the Priority Claims. Only after payment in full of the Priority Claims would general unsecured creditors receive distribution in a liquidation of the Debtor. Such a payment would not occur until well after the Effective Date, and thus its present value on the Effective Date would be less than its actual value on the hypothetical distribution date. As stated in the Liquidation Analysis, after payment of claims with higher priorities (which may in any event exceed the amounts estimated), the Debtor estimates that unsecured claims in Classes 2-5 would be paid approximately 1.62% of each dollar of unsecured Claim, while under the Plan each General Unsecured Claim will receive a dividend of no less than 3% of each dollar of unsecured Claim and Class 6 would receive 4.5%. Consequently, the Plan satisfies the best interests of the creditors test.

### 2. *Feasibility of the Plan*

Pursuant to Section 1129(a)(11) of the Bankruptcy Code, among other things, the Bankruptcy Court must determine that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtor or any successor to the Debtor under the Plan. The Debtor believes that the Plan complies with the financial feasibility standard of Section 1129(a)(11) of the Bankruptcy Code.

The Debtor's operational Projections, which are attached to this Disclosure Statement as Exhibit D, suggest that, for fiscal year 2010, the Debtor will have sufficient cash flow to pay its current debt obligations and to fund its operations. The Debtor has chosen fiscal year 2010 as an example of what it predicts to be a typical operational year, once the one-time reorganization expenses are eliminated, subject to the assumptions and qualifications contained herein and in the Projections. As a practical matter, the results of each operational year will differ from one another, and there can be no assurance, even if the Projections accurately predict operational results in fiscal year 2010, that similar results would be obtained in 2011 and 2012.

The Projections are based upon numerous assumptions that are an integral part of the Projections, including, without limitation, confirmation and consummation of the Plan in accordance with its terms, realization of the Debtor's operating strategy as a reorganized business, and no material adverse change in general business and economic conditions. To the extent that the assumptions inherent in the Projections are based upon future business decisions

and objectives, they are subject to change. The Projections were not prepared in accordance with standards for projections promulgated by the American Institute of Certified Public Accountants or with a view to compliance with published guidelines of the SEC regarding projections or forecasts. The Projections have not been audited, reviewed, or compiled by the Debtor's accountant. In addition, although they are presented with numerical specificity and the assumptions on which they are based are considered reasonable by the Debtor, the assumptions and estimates underlying the Projections are subject to significant business, economic, and competitive uncertainties and contingencies, many of which will be beyond the control of the reorganized Debtor. Accordingly, the Projections are only an estimate that is necessarily speculative in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and may increase over time. The Projections should therefore not be regarded as a representation by the Debtor or any other Person that the results set forth in the Projections will be achieved. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections. The projected financial information contained herein should not be regarded as a representation or warranty by the Debtor or any other Person that the Projections can or will be achieved. The Projections should be read together with the information in *Section IV Information Relevant to the Risks to Creditors Under the Plan,* which sets forth important factors that could cause actual results to differ from those in the Projections.

### 3.    *Acceptance by Impaired Classes*

By this Disclosure Statement, the Debtor is seeking the affirmative vote of each impaired class of Claims under the Plan that is proposed to receive a distribution under the Plan. Pursuant to Section 1126(f) of the Bankruptcy Code, a class that is not "impaired" under a plan will be conclusively presumed to have accepted such plan; solicitation of acceptances with respect to any such class is not required. Pursuant to Section 1126(g) of the Bankruptcy Code, a class of claims that does not receive or retain any property under a plan of reorganization is deemed not to have accepted the plan, although members of that class are permitted to consent, or waive objections, to its confirmation.

Pursuant to Section 1124 of the Bankruptcy Code, a class is "impaired" unless a plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim entitles the holder thereof, or (b) (i) cures any default (other than defaults resulting from the breach of an insolvency or financial condition provision), (ii) reinstates the maturity of such claim, (iii) compensates the holder of such claim for any damages incurred as a result of any reasonable reliance by such holder on any contractual provision or applicable law entitling such holder to demand or receive accelerated payments after the occurrence of a default, and (iv) does not otherwise alter the legal, equitable or contractual rights to which the holder of such claim is entitled.

Pursuant to Section 1126(c) of the Bankruptcy Code, a class of impaired claims has accepted a plan of reorganization when such plan has been accepted by creditors (other than an entity designated under Section 1126(e) of the Bankruptcy Code) that hold at least two-thirds in aggregate dollar amount of allowed claims in such class and more than one-half in number of the allowed claims of such class held by creditors (other than any entity designated under Section 1126(e) of the Bankruptcy Code) that have actually voted to accept or reject the plan. Section 1126(e) of the Bankruptcy Code allows the Bankruptcy Court to designate the votes of

any party that did not vote in good faith or whose vote was not solicited or procured in good faith or in accordance with the Bankruptcy Code. Holders of claims who fail to vote are generally not counted as either accepting or rejecting the plan.

### 4. *Confirmation Without Acceptance by All Impaired Classes*

Section 1129(b) of the Bankruptcy Code provides that the Bankruptcy Court may still confirm a plan at the request of a debtor if, as to each impaired class that has not accepted the plan, the plan "does not discriminate unfairly" and is "fair and equitable."

Section 1129(b)(2)(A) of the Bankruptcy Code provides that with respect to a non-accepting class of impaired secured claims, "fair and equitable" includes the requirement that the plan provides: (a) that each holder of a claim in such class (i) retains the liens securing its claim to the extent of the allowed amount of such claim and (ii) receives deferred cash payments at least equal to the allowed amount of its claim with a present value as of the effective date of such plan at least equal to the value of such creditor's interest in the debtor's interest in the property securing the creditor's claim; or (b) for the realization by the creditor of the "indubitable equivalent" of its claim.

Section 1129(b)(2)(B) of the Bankruptcy Code provides that with respect to a non-accepting class of impaired unsecured claims, "fair and equitable" includes the requirement that: (a) the plan provide that each holder of a claim in such class receives or retains property of a value as of the effective date equal to the allowed amount of its claim; or (b) the holders of claims in classes that are junior to the claims of the dissenting class will not receive or retain any property under the plan on account of such junior claim or interest.

The Debtor believes that the Plan does not discriminate unfairly against, and is fair and equitable as to, each impaired class under the Plan. In the event any impaired class of Claims does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the request of the Debtor if at least one impaired Class has accepted the Plan (such acceptance being determined without including the vote of any "insider" (as defined in the Bankruptcy Code) in such class), and as to each impaired class that has not accepted the Plan, if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.

## VI. IMPLEMENTATION OF THE PLAN

### A. Effect of Plan Confirmation

#### 1. *Vesting of Control in the Debtor*

As of the Effective Date of the Plan, (i) pursuant to the provisions of Sections 1141(b) and (c) of the Bankruptcy Code, all then existing property, assets and effects of the Debtor's estate shall vest in the Reorganized Debtor, free and clear of all liens, Claims, charges, encumbrances, and interests of creditors, except as expressly provided under the Plan and in the order confirming the Plan; (ii) the Reorganized Debtor may operate its businesses and may use, acquire, and dispose of property free of restrictions imposed under the Bankruptcy Code; and

(iii) the management, control and operation of the Reorganized Debtor shall become the general responsibility of the Board of Directors.

The Reorganized Debtor, as a New Hampshire not-for-profit, has no shareholders or interest holders and shall continue to operate for the common good of the residents of New Hampshire following reorganization.

The executive management of the Debtor is comprised of:

a.     Deborah M. Rodier, R.N., B.A., Ms. Rodier is the Debtor's Executive Director, Administrator Supported Residential Care Unit, Director of Resident Services, Director of Nursing and MDS Coordinator.  Ms. Rodier has a B.A. in business administration and a degree in nursing and holds various certifications in geriatric care.  Ms. Rodier has been employed by the Debtor since 1998 and her annual compensation is $114,660.

b.     Verna Brewer, R.N., Ms. Brewer is the Debtor's Assisted Living Administrator. Ms. Brewer has an A.D. in nursing and has worked for the Debtor, in various capacities, for over 14 years.  Ms. Brewer's annual compensation is $87,360.

c.     Carolee Bacon, R.N., B.S., Ms. Bacon is the Debtor's Director of Nursing.  Ms. Bacon holds a bachelor of science in nursing and has held various positions with the Debtor since 1997.  Ms. Bacon's annual compensation is $76,960.

## 2.     Cancellation of Instruments

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, certificates, security agreements, mortgages, pledges, indemnities, collateral assignments, undertakings, guarantees, and other instruments and documents creating a Claim against the Debtor will no longer be outstanding and will be cancelled, retired, and deemed terminated, and will cease to exist, as permitted by Section 1123(a)(5)(F) of the Bankruptcy Code.

## 3.     Term of Injunction and Stays

Except as provided in the Plan or in the order confirming the Plan, as of the Effective Date, all Entities that have held, currently hold or may hold a Claim or other debt or liability that is discharged, are permanently enjoined from taking any of the following actions on account of any such discharged Claims, debts, or liabilities or rights: (a) commencing, conducting or continuing in any manner, directly or indirectly, any action or other proceeding against the Reorganized Debtor or its property; (b) creating, perfecting or enforcing any lien or encumbrance against the Reorganized Debtor or its property; (c) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Reorganized Debtor or its property; (d) enforcing, levying, attaching, collecting, or otherwise recovering by any manner or means any judgment, award, decree, or order; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

## 4.     Exculpation

Neither the Debtor nor any of its officers, directors, employees or members (collectively, the "Exculpated Persons"), will have or incur any liability to any Entity for any act taken or omitted to be taken in connection with or related to formulating, preparing, disseminating, implementing or confirming the Plan, the Disclosure Statement or any contract, instrument, release, or other agreement or document created in connection with the Plan or any other act taken or omitted to be taken in connection with the Debtor's Chapter 11 Case; provided that the foregoing provisions shall have no effect on the liability of any Entity that results from (1) any act or omission that is determined in a Final Order to have constituted fraud, gross negligence, or willful misconduct; or (2) any breach of the confirmed Plan.

B.    Effective Date Actions

On the Effective Date, the Debtor shall (a) if requested by the Secured Creditor, execute and deliver amended loan documents consistent with the terms hereof; and (b) make distributions to unsecured creditors as called for hereunder.

C.    Executory Contracts and Unexpired Leases

The Debtor believes that its interest rate swap agreement with Lehman Brothers was terminated pre-petition.  To the extent Lehman Brothers contends that termination has not occurred, the Debtor will reject the Lehman Brothers contract as of the Effective Date.

All the remaining executory contracts and leases listed on Schedule G of the Debtor's Petition will be assumed.

All of the Debtor's pre-petition insurance policies and any agreements, documents, or instruments relating thereto, are treated as executory contracts under the Plan. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor may hold against any entity, including, without limitation, the insurer under any of the Debtor's policies of insurance.  Other than the foregoing, the Debtor is not aware of any other executory agreements or any cure amounts that must be accounted for.

D.    Distributions Occurring On and After the Effective Date

Notwithstanding anything to the contrary in the Plan, any payment required under the Plan to be made by the Debtor on or immediately following the Effective Date shall be made by the Debtor as soon as practicable following the Effective Date.

The Debtor may on a *Pro Rata* basis prepay obligations under the Plan on account of Class 2-5 Claims at any time on or after the Confirmation Date. Notwithstanding anything to the contrary in the Plan, any holder of any Claim may waive any right under the Plan or agree to a less favorable treatment than the treatment to which it is entitled under the Plan. Any such waiver or agreement shall inure to the benefit of the Debtor and shall not increase the *Pro Rata* rights of other holders of Claims.

The Debtor may, pursuant to the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim and against the distributions to be made on account of that Allowed Claim pursuant to the Plan (before any such distribution is made), the Claims, rights,

and Causes of Action that the Debtor holds against the holder of that Allowed Claim, provided that neither the failure of the Debtor to set off nor the allowance of a Claim shall constitute a waiver or release by the Debtor of any Claim, right, or Cause of Action.

No interest accruing on or after the Petition Date shall be payable on any Claim except as may be required by law on any Allowed Administrative Expenses, Priority Tax Claims, or Secured Claims.

In connection with the Plan, to the extent applicable, the Debtor shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions under the Plan shall be subject to withholding and reporting requirements. Notwithstanding any other provision of the Plan, each Entity who receives any distribution pursuant to the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligation imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

E.      Retention of Claims

Following the Effective Date, pursuant to Section 1123(b) of the Bankruptcy Code, except as otherwise provided in the Plan, the Debtor will retain all Causes of Action that the Debtor had or had power to assert immediately prior to the Effective Date, and may commence or continue in any appropriate court or tribunal, including, without limitation, in the Bankruptcy Court, any suit or other proceeding for the enforcement of such Causes of Action. Without limiting the foregoing, the Debtor reserves the right to commence actions under Section 547 of the Bankruptcy Code against the recipients of payments from the Debtor within ninety (90) days prior to the Petition Date, which recipients are listed on the Schedules.

The Debtor has performed an analysis regarding possible actions under Section 547 of the Bankruptcy Code and has determined there are no possible recoveries; however, this analysis is not binding upon the Unsecured Creditor Committee who may chose to conduct its own analysis.

F.      Discharge

The distributions and other agreements in the Plan shall be in full and complete satisfaction of, and will result in the full and complete discharge, satisfaction and release of, all Claims against the Debtor that arose prior to the Confirmation Date. Except as expressly provided in the Plan or in an order confirming the Plan, confirmation of the Plan will, as of the Effective Date, discharge the Debtor from all Claims and any other debts that arose prior to the Effective Date and all debts of the type specified in Sections 502(g), 502(h), and 502(i) of the Bankruptcy Code, whether or not (i) a proof of claim based on such a debt has been filed or is deemed to have been filed pursuant to Section 501 of the Bankruptcy Code, (ii) a Claim based on such a debt is Allowed under the Plan or pursuant to Section 502 of the Bankruptcy Code, or (iii) the holder of a Claim based on such a debt has accepted the Plan.

G.      Severability

Should any provision in the Plan be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Plan so long as such determination does not affect any material term or benefit of the Plan.


## VII. BAR DATES AND OBJECTIONS TO CLAIMS

A.      Administrative Expenses Bar Date

All requests for payment of administrative costs and expenses permitted under Section 503(b) of the Bankruptcy Code (except for taxes, trade debt, or customer deposits incurred in the ordinary course of business, and applications under Section 330 for final compensation of professional Persons for services rendered in the Chapter 11 Case) shall be filed with the Bankruptcy Court and served on counsel to the Debtor, John M. Sullivan, Preti Flaherty, PLLP, P.O. Box 1318, Concord, NH 03302-1318, **no later than the day prior to the first date on which the Confirmation Hearing is scheduled or such other date as may be set by the Bankruptcy Court.** Any such Claim that is not filed by such date shall be forever barred and shall not constitute an Allowed Claim.

B.      Original Bar Date

Except as provided in Section VII. A. above, all holders of Claims against the Debtor shall be subject to the Bar Date for nongovernmental Claims and the Governmental Bar Date for Claims of Governmental Units. Any Claims of such holders that have not been filed by such applicable date shall be forever barred and shall not constitute Allowed Claims.

C.      Objections to Claims

Objections to Claims against the Debtor shall be filed on or before (the "Claims Objection Date") for all Claims against the Debtor, the date that is ten (10) days following the Effective Date; provided that the failure to object to a Claim by the Claims Objection Date shall not constitute a waiver or release of any affirmative claims the Debtor may be entitled to assert against a creditor, including, without limitation, Avoidance Actions. Any objections to Claims against the Debtor, not resolved consensually by agreement with the Debtor, shall be resolved before the Bankruptcy Court.

D.      Estimation of Claims

The Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.

In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed Amount of such Claim or a maximum

limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanisms approved by the Bankruptcy Court.

E.      Payments and Distributions on Disputed Claims

Notwithstanding any provision in the Plan or the order confirming the Plan to the contrary, except as otherwise agreed to by the Debtor in its sole discretion, or as otherwise ordered by the Bankruptcy Court, no partial payments and no partial distributions shall be made with respect to a disputed Claim until the resolution of such disputes by settlement or Final Order. After a disputed Claim becomes an Allowed Claim, the holder of such Allowed Claim shall receive all payments and distributions to which such holder is then entitled in accordance with the Plan. Notwithstanding the foregoing, any holder of both an Allowed Claim(s) and a disputed Claim(s) shall receive the appropriate payment or distribution on the Allowed Claim(s), although, except as otherwise agreed by the Debtor in its sole discretion, no payment or distribution shall be made on the disputed Claim(s) until such dispute is resolved by settlement or Final Order. The Debtor may, in its sole discretion, reserve from any distribution an amount equal to or less than the amount of any disputed Claims, and, in the case of any such reserve, the Debtor may adjust the *Pro Rata* distributions to the holders of Allowed Claims accordingly. Notwithstanding anything to the contrary in the Plan and except as provided therein with respect to Administrative Expenses, Priority Claims, and Secured Claims, no interest shall be paid on any disputed Claim that becomes an Allowed Claim.

F.      Settlement of Disputed Claims

From and after the Effective Date, the Reorganized Debtor shall have the authority, without the need for Bankruptcy Court approval, to settle any objection to any Claim, and, in its sole discretion, to prosecute, waive, or settle any Cause of Action that the Reorganized Debtor may have.


## VIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of the Plan to the Debtor and to certain holders of Claims. The summary provides general information only and does not purport to address all of the federal income tax consequences that may be applicable to the Debtor or to any particular holder of Claims in light of such holder's own individual circumstances. In particular, the summary does not address the federal income tax consequences of the Plan to holders of Claims that may be subject to special rules, such as foreign persons, S corporations, banks, insurance companies, financial institutions, regulated investment companies, broker-dealers, small business investment corporations, investors in pass through entities, tax-exempt organizations, employees of the Debtor with Claims relating to their employment, and holders who hold their Claim as part of a hedging transaction, straddle, conversion transaction, or other integrated transaction. The summary also does not address foreign, state, local, estate or gift tax consequences of the Plan, nor does it address the federal

income tax consequences to (i) holders whose Claims are entitled to reinstatement or payment in full in cash or are otherwise unimpaired under the Plan, or (ii) holders (if any) whose Claims are extinguished without distribution in exchange therefore.

This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the final, temporary and proposed Treasury regulations promulgated thereunder, judicial decisions and administrative rulings and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof and all of which are subject to change (possibly with retroactive effect) by legislation, judicial decision or administrative action. Moreover, due to a lack of definitive authority, uncertainties exist with respect to various tax consequences of the Plan. The Debtor has not requested a ruling from the IRS with respect to the matters discussed in this summary and no opinion of counsel has been sought or obtained by the Debtor with respect thereto.

THE FEDERAL INCOME AND OTHER TAX CONSEQUENCES TO HOLDERS OF CLAIMS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT. THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES OF THE PLAN TO THEM AND TO THE DEBTOR. THE DEBTOR IS NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY HOLDER OF A CLAIM, NOR IS THE DEBTOR OR ITS COUNSEL RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.

A.    Consequences to the Debtor

Although the Debtor does not expect to realize any material cancellation of debt ("COD") income upon the discharge of the Claims pursuant to the Plan, it is possible that some COD income may be realized. In the event of the realization of COD income as a result of the Plan, the Debtor does not expect to recognize such COD income, but will instead reduce tax attributes after the end of the tax year in which the COD income is realized. The Debtor anticipates that its net operating losses and net operating loss carryovers ("NOLs"), general business and minimum tax credit carryovers, capital losses and capital loss carryovers would be sufficient to eliminate COD income, if any, but there can be no assurance of this. The basis in the Debtor's depreciable assets could, but is not expected to, be reduced or eliminated as a result of the Plan and its tax consequences. The extent to which the Debtor's federal income tax attributes will be reduced depends on certain factual matters and on certain legal issues that are subject to varying interpretations. Because any reduction in tax attributes does not occur until after the determination of tax for the year, any resulting COD will not impair the Debtor's ability to use its tax attributes (to the extent otherwise available) to reduce the tax liability, if any, resulting from the implementation of the Plan.

B.    Consequences to Holders of Allowed Claims

In general, each holder of an Allowed Claim will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by such holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (ii) such holder's adjusted tax basis in such Claim (other than any Claim for accrued but unpaid interest). In general, the "amount realized" by a holder will equal the sum of any cash and the aggregate fair market value of the property received by such holder pursuant to the Plan. A holder's adjusted tax basis in its Claim will be adjusted by, among other things, the amount of any bad debt deduction previously taken with respect to such Claim.

The amount of gain or loss realized by the holders of Allowed Claims may be affected by subsequent distributions as the result of the disallowance of Disputed Claims. Where gain or loss is recognized by a holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the nature and origin of the Claim, the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder had previously claimed a bad debt deduction.

Because creditors will receive less than 100% of their Claims under the Plan, and assuming none of their Claims were purchased at a discount, the Debtor does not expect that any creditors will experience a tax gain as a result of the Plan. Any potential loss will depend, on a creditor-by-creditor basis, on each creditor's actual recovery under the Plan.

Holders of Claims are urged to consult their tax advisors regarding the reporting of amounts distributed under the Plan.

C.    Information Reporting and Withholding

All distributions to holders of Allowed Claims under the Plan are subject to any applicable withholding tax requirements. Under federal income tax law, interest, dividends, and other reportable payments, may, under certain circumstances, be subject to "backup withholding" at a rate that is currently 28%. Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN") and to state that the holder is a U.S. citizen or resident, (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

AS INDICATED ABOVE, THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS, HER, OR ITS OWN TAX ADVISOR REGARDING THE TAX CONSEQUENCES OF THE PLAN.

# IX. OTHER MATTERS

## A. Alternatives to Confirmation and Consummation of the Plan

If the Plan is not confirmed and consummated, the Debtor's alternatives include (i) liquidation of the Debtor's estate under Chapter 7 or Chapter 11 of the Bankruptcy Code and (ii) the preparation and presentation of an alternative plan or plans of reorganization.

### 1. Liquidation Under Chapter 7 or Chapter 11

If no plan is confirmed, the Debtor's Chapter 11 Case may be converted to a case under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against the Debtor.

The Debtor believes that in a liquidation under Chapter 7, the wind-down expenses; the WARN Act expense; the increased deficiency claim of the Secured Creditor; the additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants, and other professionals to assist such trustees would cause a substantial diminution in the value of the Debtor's estate. The assets available for distribution to creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, arising by reason of the liquidation and the cessation of operations and failure to realize the greater going concern value of the Debtor's assets. The Liquidation Analysis prepared by the Debtor demonstrates that a Chapter 7 liquidation of the Debtor's estate would result in a substantial diminution of the value to be realized if the Debtor is permitted to continue operations as a going concern.

The Debtor could also be liquidated pursuant to the provisions of a Chapter 11 plan of reorganization. In a liquidation under Chapter 11, the Debtor's assets could theoretically be sold in an orderly fashion over a more extended period of time than in a liquidation under Chapter 7, thus resulting in a potentially greater recovery. Conversely, to the extent the Debtor's business incurs operating losses, the Debtor's efforts to liquidate its assets over a longer period of time could theoretically result in a lower net distribution to creditors than they would receive through a Chapter 7 liquidation. Nevertheless, because there would be no need to appoint a Chapter 7 trustee and to hire new professionals, a Chapter 11 liquidation might be less costly than a Chapter 7 liquidation and thus provide larger net distributions to creditors than in a Chapter 7 liquidation. Any recovery in a Chapter 11 liquidation, while potentially greater than in a Chapter 7 liquidation, would also be highly uncertain.

Although preferable to a Chapter 7 liquidation, the Debtor believes that any alternative liquidation under Chapter 11 is a much less attractive alternative to creditors than the Plan because of the greater return anticipated by the Plan.

### 2.    *Alternative Chapter 11 Plan*

If the Plan is not confirmed, the Debtor, or any other party in interest, may attempt to formulate an alternative Chapter 11 plan which might provide for the distribution of its assets other than as provided by the Plan. Any attempt to formulate an alternative Chapter 11 plan would unnecessarily delay creditors' receipt of distributions yet to be made and, due to the incurrence of additional administrative expenses during such period of delay, may provide for smaller distributions to creditors than are currently provided for in the Plan. Accordingly, the Debtor believes that the Plan will enable all creditors to realize the greatest possible recovery on their respective Claims with the least delay.

### B.    Amendment, Alteration, and Revocation of the Plan

Subject to the limitations contained in the Plan, (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the order confirming the Plan and (b) after the entry of the order confirming the Plan, the Reorganized Debtor may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with Section 1127(b) of the Bankruptcy Code, and may remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

The Debtor reserves the right, at any time prior to the Effective Date, to revoke and withdraw the Plan and to file subsequent plans of reorganization. If the Debtor revokes or withdraws the Plan, or if Confirmation or the Effective Date does not occur, then (a) the Plan will be null and void in all respects, (b) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan will be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, will (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, the Debtor or any other Person, (ii) prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Debtor, or (iii) constitute an admission of any sort by the Debtor or any other Person.

## X.    CONCLUSION AND RECOMMENDATION

**The Debtor believes that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest possible recoveries to holders of Claims. Other alternatives would involve significant delay, uncertainty, and substantial additional administrative costs. The Debtor urges holders of impaired Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots to the address set forth on page 2 so that they will be received no later than 4:30 p.m., New Hampshire Time, on April 26, 2010.**

Dated: March 23, 2010

PRETI FLAHERTY PLLP


By: /s/ John M. Sullivan
    John M. Sullivan (BNH 01456)
    Joshua E. Menard (BNH 06427)
    P.O. Box 1318
    Concord, NH 03302-1318
    Telephone:    603-410-1500
    Facsimile:    603-410-1501
    Email:  jsullivan@preti.com

    Counsel for the Debtor and
    Debtor In Possession


MARK WENTWORTH HOME

Debtor and Debtor In Possession


By: /s/ William C. Henson
Name:  William C. Henson
Title:  President